GOSNELL *v.* GARNER.

4-5583                                    132 S. W. 2d 187

Opinion delivered October 16, 1939.

*Carter & Taylor,* for appellant.

*J. E. Yates, J. D. Benson* and *John E. Harris,* for appellee.

HOLT, J.   Mrs. Frank Gosnell died intestate in June, 1926, leaving her husband, Frank I. Gosnell, and Henry Carter, George and Frank I. Gosnell, Jr., children, as her sole surviving heirs.

Her husband, Frank I. Gosnell, was first appointed administrator of her estate and served until sometime in 1932. Appellee, Lottie Garner, succeeded Frank Gosnell and served as administratrix of the estate until the early part of 1936 when she was in turn succeeded by W. J. Higgins. Appellee was the sister of the deceased.

On September 25, 1936, appellee, Lottie Garner, filed claim against the Gosnell estate in the Franklin probate court for $3,425, and on October 9, 1936, filed another claim for an additional sum of $1,145, or a total of $4,570.

The probate court allowed her a total sum of $3,970 on both claims.

An appeal was granted appellants to the circuit court, and the matter was by agreement submitted to the court sitting as a jury, and he entered judgment in favor of appellee, Lottie Garner, against the estate for the total sum of $3,895. From this judgment of the circuit court comes this appeal.

This record reflects that at the time of Mrs. Frank Gosnell's death early in 1926 there were two outstanding valid claims against her estate in the form of two promissory notes, one for $7,000 which Mrs. Gosnell and her husband had executed in favor of a Mr. Randolph, and another for $2,000 which she and her husband had executed in favor of the Bank of Mulberry. These two claims, totaling $9,000, were properly filed on November 9, 1926, duly approved and allowed by the probate court as claims against the estate in favor of Mr. Randolph and the Bank of Mulberry during the time that Frank Gosnell, the husband of the deceased, acted as administrator from the death of Mrs. Gosnell up to 1932. There is no contention here that these two claims were not valid claims against the estate.

Appellee, Lottie Garner, bases $3,000 of her claim against Mrs. Gosnell's estate for money which she claims to have borrowed on lands of her own, not the property of the estate, which said money she used for the benefit of the estate to help pay off the claim of $9,000 against said estate. The remainder of the total of her claim al-

lowed by the court below embodied certain advancements which she claims to have made to the children of the deceased and for moneys advanced by her for expenses of the administration.

It is first earnestly insisted by appellee that her entire claim should be allowed on the doctrine of subrogation. We cannot agree. We think it clear that the only possible part of appellee's claim which this doctrine of subrogation could effect would be the $3,000 which appellee claims was her own personal money used by her to pay off a part of the $9,000 in valid claims allowed against the estate as heretofore indicated.

We do not think that under the facts in this record she was in any manner subrogated to the rights of the Bank of Mulberry and Mr. Randolph, who were allowed claims totaling $9,000 against the estate by virtue of the two notes which they. held at the time of Mrs. Gosnell's death.

The facts relating to this $3,000 item are to the following effect: On the 10th day of February, 1930, during the time that Frank I. Gosnell was acting as administrator, the probate court directed him to sell so much of the lands of the estate as were necessary to pay the then existing debts of the estate. Following this order Gosnell, as administrator, reported sale of certain lands of the estate to the court. The probate court made an order confirming the report of sale to pay debts and, among other things, said: "That the action of the said Frank I. Gosnell as such administrator in advertising and making such sale is in all things approved and confirmed by the court, and that he as such administrator is hereby authorized to accept said cash so offered by the said Ed Garner, and upon the receipt of the same, he is authorized and directed to execute and deliver to the said Ed Garner a deed to a sufficient number of acres of said lands so purchased to equal in value the sum of $9,000, that being the amount of debts due by said estate and for which said sale was made." The order further recited: "That Ed Garner the purchaser of said lands at

said sale is offering to waive the time of payment and to pay cash therefor."

Following this order, an administrator's deed was executed in favor of Ed Garner for a consideration of $9,000, and was for the purpose of securing funds with which to pay all the debts of the estate then outstanding. This deed conveyed approximately one hundred forty-five acres of land belonging to the estate, all lying in Franklin county, and was dated August 4, 1930. Shortly after Garner received this deed he conveyed by warranty deed this one hundred forty-five acre tract to his wife, Lottie Garner, appellee.

Upon the receipt of this deed Mr. Garner and his wife, the appellee, secured the $9,000 with which to pay the Gosnell estate for the lands, in the following manner as testified by Mr. Garner: "We didn't have any money to pay for this land so my wife went to the Arkansas Valley Trust Company in Fort Smith and borrowed $5,000, and $4,000 from L. T. Morgan at Altus, and we paid off this note to Mr. Randolph and the Bank of Mulberry. She didn't owe the Bank of Altus. The $9,000 borrowed was the $9,000 that Mrs. Garner put in the estate to keep the land in the estate. We paid the Arkansas Valley Trust Company some money and then sold eighty acres of land to Mr. Wilson and paid Mr. Morgan back the $4,000, and then we borrowed $3,000 from the Federal Land Bank and took up the indebtedness from the Arkansas Valley Trust Company because we could get a longer term and a small rate of interest. We got $6,000 for eighty acres we sold Mr. Wilson. The $4,000 indebtedness, we deducted from the $6,000 and that left $2,000 and we paid the Arkansas Valley Trust Company $1,000. At the time we executed the mortgage for $3,000 and borrowed the $3,000, we paid Mr. Morgan what we owed him and still owed the Arkansas Valley Trust Company $3,000. At the time, the Gosnell estate did not have money to pay the $3,000 to the Arkansas Valley Trust Company. My wife was not the administratrix of the estate at that time. While she was administratrix, she made application to the Federal Land Bank for a loan

on part of her land for the purpose of extending the loan on the boys' lands and it was refused because of minor heirs. At that time two of the boys were minors and maybe three. The Federal Land Bank turned us down. Then we tried the other method in order to finish paying the balance of $3,000 which the Gosnell estate owed. It is still not paid. Mrs. Garner put a mortgage on 245 acres of my land to the Federal Land Bank. We never received from the Mrs. Frank Gosnell estate the principal sum of $3,000.''

We think it clear on this record that at the time this one hundred forty-five acre tract was sold to him on order of the probate court it was for the purpose of paying all the outstanding valid debts against the Gosnell estate at that time, which the court found to be $9,000; that appellee, Mrs. Garner, after her husband had deeded the property over to her, immediately borrowed $5,000 from the Arkansas Valley Trust Company in Fort Smith and $4,000 from L. T. Morgan at Altus, giving a part of the 145 acres in question as security for the loan from Morgan, and that she took this $9,000 and paid off all the outstanding claims against the estate, which amounted to $9,000. The evidence shows that she later sold eighty acres of this land for $6,000 and this money she used to repay Morgan the $4,000 which she owed him and the Arkansas Valley Trust Company at least $1,000 on what she owed it. This would leave in her possession approximately sixty-five acres of the land in question, to which she at the present time has title, and probably $4,000 of the money which she borrowed from the Arkansas Valley Trust Company. We think, therefore, that this alleged claim of $3,000 against the estate must fail. When appellee instead of paying the $9,000, the consideration for the one hundred forty-five acres of land purchased from the estate, into the hands of the administrator, paid off the two notes in question, the Randolph $7,000 note and the Bank of Mulberry $2,000 note, all debts of the estate were then paid in full and the estate owed her nothing on her $3,000 claim.

We can see no application here for the doctrine of subrogation. What appellee did was as a volunteer and

a stranger, and "a stranger and volunteer as these terms are used with reference to the subject of subrogation, is one who, in no event resulting from the existing state of affairs, can become liable for the debt, and whose property is not charged with the payment thereof and cannot be sold therefor. . . . Anyone being under no legal obligation or liability to pay the debt is a stranger, and if he pays the debt, a mere volunteer." 25 R. C. L., par. 11, p. 1325.

In volume 60, C. J., par. 27, pp. 716-719, the text writer states: ". . . A mere volunteer or intermeddler who, having no interest to protect, without any legal or moral obligation to pay, and without an agreement for subrogation, or an assignment of the debt, pays the debt of another is not entitled to subrogation, the payment in his case absolutely extinguishing the debt. The payor must have acted on compulsion, and it is only in cases where the person paying the debt of another will be liable in the event of a default or is compelled to pay in order to protect his own interests, or by virtue of legal process, that equity substitutes him in the place of the creditor without any agreement to that effect; in other cases the debt is absolutely extinguished. In order for a person who, having no interest to protect and without any legal or moral obligation to do so, pays the debt of another to be entitled to subrogation, he must have an agreement, express or implied, therefor, or a request from the debtor to pay, which is in effect an implied contract, or ratification of the payment, or an assignment of the debt."

We cannot agree to appellee's contention that her claim should be allowed as expenses of administration. An administrator may not expend the money of an estate for any purpose except to pay the debts of the decedent or expenses incurred in due course of administration of the estate to pay the debts personally due by the decedent. All of the debts of the Gosnell estate were paid in 1930 when one hundred forty-five acres of the land were sold to Ed Garner for $9,000 cash and by him deeded to appellee.

In *Stuckey* v. *Stephens,* 115 Ark. 572, 577, 171 S. W. 908, this court said: "It is not the .policy of the law to encourage, or to permit, the administrator to expend the money of the estate for any purpose except to pay the debts of the decedent, or expenses incurred in the course of administering the estate to pay the debts personally due by the decedent. The administrator, as such, has nothing to do with the education of the children, nor the support of the widow, nor with the permanent improvement of the lands of the estate, further than is necessary to make these lands a source of income for the payment of the debts. Indeed, under the statute he has no control whatever over the lands except for the payment of debts, and no necessity for any such control existed in the present case."

And again in *Yarborough* v. *Ward,* 34 Ark. 204, this court laid down the rule as follows: "Harmonizing this opinion with the former expressions of this court, we have developed a plain, intelligible and rational system. Except for funeral expenses, no debts can be created against an estate after death. They must be then existent, or arise out of obligation incurred by the deceased whilst alive. Only such can be presented for allowance, classification and payment in statutory order, out of the assets found in the hands of the representative after settlement.

"Save with regard to funeral expenses, no provision is made for the classification and settlement of demands arising in the course of administration. Those who render services, or furnish material useful to the estate, stand upon the common law regulating contracts, and may sue the person with whom the contract is made; and must sue him, if at all, in his individual capacity."

In the more recent case of *Miller* v. *Oil City Iron Works,* 184 Ark. 900, 45 S. W. 2d 36, this court said: "The circuit court properly refused to allow the administratrix the amount claimed to have been expended by her for the support and education of the minor children of the intestate. The reason is that the administratrix had nothing to do with the support and education

of such minor children. *Alcorn* v. *Alcorn*, 183 Ark. 342, 35 S. W. 2d 1027.".

It is our view that none of the items making up appellee's claims was ever authorized by the probate court and that they were not authorized by law.

On the whole case we conclude that the trial court erred in allowing and sustaining appellee's claims, and the judgment is, therefore, reversed with instructions to enter a judgment disallowing and dismissing said clams.