### In re ELKINS ENERGY CORPORATION, Debtor.

#### Bankruptcy No. 79–00063–B.

United States Bankruptcy Court,
W.D. Virginia,
Big Stone Gap Division.

July 12, 1984.

Robert T. Copeland, Abingdon, Va., and James E. Nunley, Bristol, Va., for debtor.

Robert W. Detrick, Bristol, Va., James W. Elliott, Jr., Bristol, Va., Trustee.

Michael A. Bragg, Bristol, Va., for Coy & Regina Mullins.

## MEMORANDUM OPINION AND ORDER

H. CLYDE PEARSON, Bankruptcy Judge.

Elkins Energy Corporation, Debtor herein which was engaged in the coal mining business, filed a voluntary petition in this court on August 3, 1979, seeking relief under Chapter XI of the *Bankruptcy Act of 1898.* On October 8, 1980, a Proof of Claim (# 107) in the amount of $156,000.00 was filed by Coy and Regina Mullins. The Mullins' claim sought priority as a pre-petition tax claim under § 64(a)(4) of the *Act* by virtue of subrogation. A Plan was confirmed, but the case was subsequently converted to Chapter IV liquidation. The Trustee filed an objection to the Mullins' claimed priority right to subrogation.

Upon hearing the objection and consideration of briefs submitted by the parties in support of their positions, the court renders the following decision denying the Trustee's objection as to a portion of the claim.

At all times relevant to this proceeding, Regina Mullins was employed by the Debtor as a key staff member of the office personnel and bookkeeper. She was neither a stockholder nor officer of the Debtor corporation. As a member of the principal office personnel and bookkeeper, Mullins was aware of the Debtor's financial difficulties as evidenced by the frequent and substantial overdrafts in the Debtor's checking account.

On December 11, 1978, Mullins and her husband were approached by the principal officers of Elkins Energy who indicated that they were seriously delinquent in the payment of certain payroll taxes which had been duly assessed by the IRS and, if these taxes were not paid, the company would have to shut down and they would go to jail. Mullins testified at trial that Charles Elkins, president of Elkins Energy, asked her to lend $150,000.00 to the corporation in order to pay the delinquent taxes.

Mullins, faced with the protection of her favorable employment position and the compelling circumstances presented, did on December 12, 1978 borrow $156,000.00 from Cumberland Bank & Trust. The Mullinses signed a short-term 90-day note with interest at 12½ percent annually. To secure the loan, the Mullinses gave the bank a Deed of Trust on their personal residence. Net loan proceeds of $150,768.00 were deposited into Mrs. Mullins' checking account. The short-term loan was to be a temporary arrangement in order to take care of the IRS liability and then repaid.

On the same day, December 12th, Mullins wrote a check for $150,000.00 payable to Elkins Energy and delivered the same to Charles Elkins. Charles Elkins, as president of the Debtor, signed a 90-day note for $156,000.00 (with interest at 12½ percent) payable to Coy and Regina Mullins.

A third transaction occurred on December 12, 1978. Elkins Energy paid $54,-160.55 to the Internal Revenue Service (IRS) through its agent, who was physical-

ly present in the Debtor's offices to receive the tax payment and clear the pending tax emergency. From that date until January 3, 1979, a total of $158,616.10 was paid to IRS on delinquent taxes. Another $60,-551.98 was paid on January 22, 1979 and on February 2, 1979. These payments essentially brought the Debtor current on payroll taxes.

Elkins Energy paid the interest on its debt to the Mullinses until the time the Chapter XI petition was filed; no principal payments were ever made. Approximately $32,000.00 was paid upon the Mullins' claim under the confirmed Chapter XI Plan, all of which was in turn paid by the Mullinses upon their note to Cumberland Bank & Trust. When the Mullinses were unable to pay off their note to the bank, foreclosure proceedings were initiated and the Mullinses subsequently deeded their residence over to the bank in satisfaction of their obligation.

Coy and Regina Mullins contend that the funds lent to the Debtor were used to pay taxes due IRS and, as subrogees to IRS, they are entitled to a priority claim against the Debtor. The Trustee objects on two grounds: (1) that there is no evidence to prove that the Mullins loan was used to pay taxes; and (2) even if the money was used to pay taxes, § 64(a)(4) makes no provision for the transfer of tax priority status under the theory of subrogation.

From the evidence presented at trial, this court concludes that the Mullins loan was, in fact, used to pay Debtor's delinquent payroll taxes to the extent of $54,160.55, shown without question to have been paid from the Mullins' funds.

We turn now to the question of whether the government's right to a priority tax claim may be transferred to a non-governmental claimant by virtue of subrogation. Section 64(a)(4) does not provide the answer; nor are the courts which have considered the issue in agreement. See 3A Collier on Bankruptcy, ¶ 64.408 (14th ed. 1975).

The rule of subrogation, whereby a party paying another's debt is entitled to exercise the remedies of the original creditor against the debtor, is among the oldest of equitable doctrines. In 73 Am.Jur.2d, § 22, the treatise states:

"The flexibility of the remedy by subrogation and its constantly expanding application preclude the possibility of an exhaustive enumeration of the classes of persons who are entitled to subrogation. Certain exclusions and inclusions are, however, generally recognized. The excluded classes are composed of those who discharge debts on which their liability is primary, and those whose position is that of volunteers or strangers. It has been said that from the very nature of subrogation it could never have been intended for the relief of those who were in a condition in which they were at liberty to elect whether they would or would not be bound. Recognized inclusions are of those who, like sureties or guarantors, pay the debt of another in the performance of a legal duty imposed by contract or rules of law; those who pay the obligation of another for the purpose of protecting their own rights or interests, or supposed interests; those who pay the debt of another under an agreement for subrogation to the right of the creditor; those who pay on the invitation of the public and whose payment is favored by public policy; and persons whose funds or property have been misapplied by an agent or other fiduciary, or have otherwise been used in such a way as to enrich others unjustly."

Section 23 of said treatise states that the equitable doctrine of subrogation in its strict sense does not apply to volunteers or intermeddlers who, without any duty, moral or otherwise, pay the debts or discharge the obligations of another.

In § 24, the same treatise defines a volunteer in the following language:

"Generally speaking, the party making payment is a volunteer if, in so doing, he has *no right or interest of his own to protect,* and acts without obligation, moral or legal, and *without being requested by anyone liable on the obligation.* (*Gosnell v. Garner,* 198 Ark. 989, 132

S.W.2d 187; *Kramer v. American Fidelity & Casualty Co.* [Mun.Ct.App.Dist. Col.] 165 A.2d 924; *Martin v. Martin,* 164 Ill. 640, 45 N.E. 1007.) A volunteer may be, but is not necessarily, one who has had nothing to do with the transaction out of which the debt grew." [emphasis added]

"One is not a volunteer when he has an ·interest of his own to protect."

Further, it is stated:

"One is not a volunteer within the rule here considered where he pays the debt at the instance, solicitation, or request of the person whose liability he discharges, or of that person's agent or representative."

In § 25, the treatise further states:

"The right of subrogation is not necessarily confined to those who are legally bound to make the payment, but extends as well to persons who pay the debt in self-protection, since they might suffer loss if the obligation is not discharged. A person who has an interest to protect by making the payment is not regarded as a volunteer. In this class are included subsequent encumbrancers paying off a prior encumbrance, though only when they do so to protect their own interest. The extent or quantity of the subrogee's interest which is in jeopardy is not material. If he has any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could."

A leading case on this subject and frequently cited in cases throughout the country arose in the Fourth Circuit, being *Guaranty Trust Co. of New York v. McKenrick, et al.,* 5 F.2d 553 (4th Cir. 1925).

The issue before the court was whether certain banks who had paid taxes for the bankrupt Baltimore Pearl Hominy Company in February, 1921, which subsequently filed a petition in bankruptcy in May, 1921, would be subrogated to the tax claim paid by the banks' funds in an effort to keep the bankrupt in business at a time when it was strapped financially. The Fourth Circuit Court of Appeals held that the government had a tax lien which was satisfied by the banks' payments and that the banks were subrogated to the lien of the United States and its priority.

The court stated, at page 555, as follows:

"Having paid the lien of the government at the request of the debtor and thus preventing the seizure and sale of the property thereunder under an agreement with the debtor that if possible they should be substituted, the banks and trust companies have a very strong equity to subrogation in the distribution of the bankrupt's assets. They were in no sense volunteers, but creditors surprised by the government's large claim for taxes in arrears. They knew the Hominy Company was in danger of failure, but they hoped that the corporation's new method of extracting sugar from corn would bring success. Under these circumstances, believing it to be advantageous to themselves and other creditors, they paid the taxes to prevent destructive enforcement of payment. In doing so we think they brought themselves clearly within the principle and rule of subrogation thus stated in *Aetna Life Insurance Co. v. Middleport,* 124 U.S. 534, 548, 549, 8 S.Ct. 625, 629, 31 L.Ed. 537:

" 'These propositions are very clearly stated in a useful monograph on the Law of Subrogation, by Henry N. Sheldon, and are well established by the authorities which he cites. The doctrine of subrogation is derived from the civil law, and 'it is said to be a legal fiction, by force of which an obligation extinguished by a payment made by a third person is treated as *still subsisting for the benefit of this third person,* so that by means of it one creditor is substituted to the rights, remedies, and securities of another.' " [emphasis added]

The court further stated, on page 556:

"It is not contended that the trustees occupied the superior position of judgment creditors without notice of the circumstances which we have held created

the lien for taxes in favor of the government.

"There is a labyrinth of decisions on the subject of subrogation. We shall not undertake to go through it. Our conclusion is that the government had a lien for the taxes, and when the banks and trust companies, unsecured creditors, paid it, they were entitled by subrogation to the same preference in the distribution of the assets of the bankrupt that the government would have had but for the payment. *One who pays taxes may in a proper case be subrogated to the rights of the government in the distribution of the assets of a bankrupt estate. Dayton, Trustee v. Stanard,* 241 U.S. 588, 36 S.Ct. 695, 60 L.Ed. 1190. The question of the right of the person subrogated to the government's lien for a tax to enforce its collection by all the means available to the government as a sovereign is not before us. The other grounds upon which the claim for subrogation is made need not be considered." [emphasis added]

In the case of *In re C.O. Building Companies, Inc.,* 21 B.R. 635 (Bankr.E.D.Pa. 1982), the court there held that an officer who paid the government's tax claim was entitled to subrogation, citing *Guaranty Trust,* as well as the Supreme Court decision of *Dayton v. Stanard,* 241 U.S. 588, 36 S.Ct. 695, 60 L.Ed. 1190 (1915).

The *Guaranty Trust* case was also followed in the case of *Aetna Casualty & Surety Co., etc. v. Sherwood Distilling Co.,* 271 F.Supp. 381 (D.Md.1967), in which the court held that where the distiller's bond surety paid a government tax claim, it would be subrogated to the lien upon which payment was made. The court cited at page 389 the restatement on restitution, § 162(d), as being in accord with *Guaranty Trust* and quoted as follows: "d. Interests acquired by subrogation. Where one person is entitled to be subrogated to the position of another, he is entitled in a proceeding in equity to enforce such rights and powers as the other had before they were discharged. The extent of his rights and powers depends upon whether the other had (1) a secured

claim; (2) a claim which, although not secured, was entitled to priority over other claims; or (3) an unsecured and unpreferred claim."

Subrogation as sought to be applied in this case, of course, is not available to a mere volunteer. *In re Green River Jockey Club,* 5 F.2d 259 (W.D.Ky.1925). It will likewise be denied to one who engineers a tax sale in order to buy the bankrupt's worthless equity for the sole purpose of claiming the government's priority. *In re Matter of Gracey,* 241 F. 981 (D.C.E. D.Pa.1917).

The creditor Mullins was more than a volunteer. She held a responsible and valuable position of employment with the Debtor company; indeed, to such an extent that the chief officer of the Debtor felt, without apparent hesitation, that he could prevail upon the claimants-Mullinses to mortgage their home in the sum of $150,-000.00 to temporarily bail out the debtor corporation and continue her position of employment. This was, of course, accomplished and, as in the case of *Guaranty Trust, supra,* a note evidencing the debt was executed by the Debtor to the Mullinses. In both cases, here and in *Guaranty Trust,* the payment was in satisfaction of a federal tax assessment and lien in order to permit the Debtor to continue its operation.

Where payment is made by a person for the protection of such person's rights and interests, the courts have held that the quantity of the interest is not material. If the party does have an interest, it is unnecessary for purposes of subrogation that the interest be a substantial or material interest in some manner. *See* 83 C.J.S., *Subrogation,* § 9, page 605, note 34. The author cites for the above principle the Fourth Circuit case of *Gross v. Tierney,* 55 F.2d 578 (4th Cir.1932). In the *Gross* case, the late eminently distinguished Judge Parker, in response to the argument that the person seeking subrogation was a mere volunteer, stated that her occupying the position of stockholder, although of a defunct corporation, was sufficient and, additionally, her payment was at the request of her

brother, who was president of the corporation and secondarily liable under the obligation, and would likewise have taken the person out of the category of a mere volunteer, citing numerous authorities at page 582, in keeping with the principle that the interest need not be substantial or material.

From the facts and law herein recited, the court concludes that the Mullinses are subrogated to the IRS taxes in the sum established by the evidence and paid upon the date of the transaction of $54,160.55 and shall stand as a priority creditor in the shoes of the government to the extent of said sum in the distribution of funds held by the Trustee herein. Any remaining sum shall be a general unsecured claim. **SO ORDERED.**

Service of a copy of this Memorandum Opinion and Order shall be made by mail to the Debtor, Debtor's Attorneys, Trustee, and to Coy and Regina Mullins by counsel.